IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL 614, AFL-CIO, <br><br> Plaintiff, <br><br> v. <br><br> PECO ENERGY COMPANY, <br><br> Defendant. | CIVIL ACTION NO. 18-2283 |

## OPINION

**Slomsky, J.**                                                    **August 23, 2019**

## I.     INTRODUCTION

Plaintiff International Brotherhood of Electrical Workers, Local 614 brings this action against PECO Energy Company to vacate a labor arbitration award.  Plaintiff is a labor union that represents Bruce Champagne ("Champagne"), a PECO employee.

Champagne and PECO are parties to a Collective Bargaining Agreement ("CBA").  This case stems from a disagreement regarding the proper interpretation of the terms of the CBA.  The parties dispute the appropriate payment rate for overtime hours that Champagne worked on April 28, 2016, April 29, 2016 and April 30, 2016.

The CBA requires that all disputes between PECO and its employees are resolved through a four-part procedure.  Steps One, Two, and Three of the procedure involve communication between PECO, the Union, and the employee.  In Step Four, parties submit the matter to arbitration, where an arbitrator decides the dispute under the procedures and rules of the American Arbitration Association.

Plaintiff, on Champagne's behalf, initiated the grievance procedure with PECO, and completed Steps One through Three. The parties were unable to come to an agreement, so they continued to Step Four and submitted the dispute to arbitration. The arbitrator issued a decision in favor of PECO. Plaintiff now seeks to vacate the arbitration award, contending that the arbitrator exceeded her authority under the CBA by considering issues that were not previously raised in the prior steps of the grievance procedure. Defendant asserts to the contrary that the arbitrator's decision was proper and should not be vacated. Before the Court are the parties' Cross-Motions for Summary Judgment. This Court has jurisdiction over this case under Section 301 of the Labor Management Relations Act ("LMRA")[1] and Section 10 of the Federal Arbitration Act.[2]

---

[1] This section of the LMRA states in relevant part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction over the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). It further provides:

> For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

29 U.S.C. § 185(c).

[2] The Federal Arbitration Act provides in pertinent part:

> (a) In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—
>
> > (1) where the award was procured by corruption, fraud, or undue means;

For the reasons that follow, the Court will grant Defendant's Motion for Summary Judgment and to Confirm the Arbitration Award and deny Plaintiff's Motion for Summary Judgment.

## II.    BACKGROUND

### A.  General Factual Background

Plaintiff International Brotherhood of Electrical Workers, Local 614 ("Plaintiff" or "Union") is a national labor union organization.  It represents hundreds of thousands of Pennsylvania employees.  This dispute involves Defendant PECO Energy Company[3] ("Defendant" or "PECO") and one of its employees, Bruce Champagne ("Champagne" or "Grievant"), who is a member of the Union.  (Doc. No. 1 ¶ 1; Doc. No. 1-1 at 185.)  The Union and PECO are parties to a collective bargaining agreement ("CBA") that sets forth the terms and conditions of labor for employees who are members of the bargaining unit.  (Doc. No. 1 ¶ 5.)

---

(2)   where there was evident partiality or corruption in the arbitrators, or either of them;

(3)   where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4)   where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

[3]   Headquartered in Philadelphia, PECO is Pennsylvania's largest electric and natural gas utility company.  It supplies electric power to more than 1.6 million customers, and natural gas to more than 511,000 customers in southeastern Pennsylvania.  PECO is a subsidiary of Exelon Corporation, the nation's leading competitive energy supplier.  PECO, An Exelon Company, https://www.peco.com/AboutUs/Pages/Default.aspx (last visited: Aug. 12, 2019).

Champagne is employed as an aerial line mechanic or "troubleman" in PECO's Distribution System Organization ("DSO"). (Doc. No. 1-1 at 185.) He works in Bucks County and Montgomery County, Pennsylvania. (Id.) As a troubleman, his job is to provide emergency response services to PECO customers when there is an incident that causes disruption or loss of service. (Id.) All DSO employees are assigned to one of the following three shifts: (1) a daylight shift from 7:00 a.m. to 3:00 p.m., (2) a back-shift from 3:00 p.m. to 11:00 p.m., or (3) a night shift from 11:00 p.m. to 7:00 a.m. (Id.) Troublemen typically work a five-day week and have two days off. (Id.) The first day off is called the "XA Day" ("XA Day") and the second day off is known as the "XB Day" ("XB Day"). (Id.)

In addition to their regular job duties, troublemen sometimes have the option to volunteer for overtime work called "guaranteed switching." Guaranteed switching involves shutting down or isolating equipment within a PECO facility for construction or maintenance. (Id.) PECO usually schedules guaranteed switching hours in advance and offers it to mechanics on an overtime basis. (Id.)

The company has a procedure for assigning guaranteed switching work to employees. First, the work is offered to employees in the county where the work is located who are scheduled for an XA Day.[4] (Id.) If there are no volunteers, then the work is offered to employees who are scheduled for an XB Day. (Id.) If there are still no volunteers, the work is offered in the same order to mechanics in a sister county who are scheduled for an XA Day or an XB Day. (Id.) If the work has not been scheduled at that point, it is offered to an employee who is scheduled to work on the same day that work is needed. (Id. at 185-186.)

---

[4] If an employee is scheduled for an XA Day, that means he or she is scheduled to have that day off.

PECO offered guaranteed switching work to troublemen in Montgomery County to be performed from April 28, 2016 to April 30, 2016. (Id.) Luis Maldonado ("Maldonado"), Champagne's DSO Supervisor, offered the guaranteed switching work to aerial line mechanics in Montgomery County and Bucks County who were scheduled for XA or XB days during that period, but no one accepted the offer. (Id.) Following procedure, he then offered the work to troublemen in Montgomery County who were already scheduled to work on those days. (Id.) On April 22, 2016, Champagne accepted it. (Id.) He was scheduled to work from 3:00 p.m. to 11:00 p.m. over the three days. (Id.) Because he accepted the guaranteed switching work, his schedule was amended to the following:

| Date | Guaranteed Switching Work | Regularly-Scheduled Shift |
|---|---|---|
| April 28, 2016 | 11:00 a.m. to 3:00 p.m. | 3:00 p.m. to 11:00 p.m. |
| April 29, 2016 | 7:00 a.m. to 3:00 p.m. | 3:00 p.m. to 11:00 p.m. |
| April 30, 2016 | 7:00 a.m. to 3:00 p.m. | 3:00 p.m. to 11:00 p.m. |

When Champagne filled out his timesheet for this period, he requested premium pay[5] for four hours on April 28, 2016, sixteen hours on April 29, 2016 and sixteen hours on April 30, 2016. Champagne sought overtime pay for the guaranteed switching hours in addition to the eight hours of his regular scheduled shifts on April 29, 2016 and April 30, 2016. (Id.) The parties agree that Champagne should receive premium overtime pay for the guaranteed switching hours, but do not agree that he should receive overtime pay for his regularly scheduled shifts.

---

[5] Premium pay is overtime pay.

Champagne believed he was entitled to premium pay because he worked within the "work rest period."[6] Maldonado corrected the timesheet, and changed it so that Champagne would be paid as follows:

- Four hours of premium pay for the guaranteed switching hours before the start of his regularly scheduled shift of April 28, 2016.

- Eight hours of straight pay[7] for his regularly scheduled shift on April 28, 2016.

- Eight hours of premium pay for his guaranteed switching hours before his regularly scheduled shifts on April 29, 2016 and April 30, 2016.

- Eight Hours of straight pay for his regular shift on April 28, 2016 and April 29, 2016.[8]

**B. Grievance Procedure**

Article X of the CBA sets forth the following four steps to address grievances between PECO and its employees ("Grievance Procedure" or "Procedure"):

Step 1 ("Step One")

Notice to Immediate Supervisor

---

[6]  This term is defined in Article 4.12 of the CBA as follows:

> After sixteen (16) or more consecutive hours of work or after sixteen or more hours of work within a 24-hour period preceding the start of a scheduled tour of duty, employees will be given a rest period of eight hours before resuming regularly scheduled work. Employees will be paid for the hours of this rest period that overlap scheduled working hours. When conditions are such that an employee must report to work on a regular schedule before the expiration of the rest period of eight (8) hours, such rest period hours that remain will be paid for at the applicable overtime rate."

(Doc. No. 1-1 at 27-30.)

[7]  Straight pay means pay at the regular rate.

[8]  In sum, Maldonado changed the timesheet to reflect premium pay for the additional guaranteed switching hours, and straight pay for the regularly scheduled hours.

Within thirty (30) calendar days after the event giving rise to the grievance or after the affected Employee or Union Steward should have known of the event, the affected Employee and/or steward must discuss the grievance with the Employee's immediate supervisor. Additionally the Employee or steward must submit to the supervisor the proper documentation on the approved form stating the issues of the complaint. If after the discussion the affected Employee or Union Steward still believes there has been a violation, the Employee or steward shall fill out and sign the Step 1 grievance form.

The steward will have ten (10) calendar days from the date of the discussion to fill out and sign the Step 1 grievance form, and submit it to the Employee's immediate supervisor with a copy to the local Human Resources Representative.

The supervisor will have ten (10) calendar days from the receipt of the Step 1 grievance form to respond with an answer to the grievance in writing. The response will be forwarded to the steward by the supervisor.

(Doc. No. 1-1 at 84-85.)

Step 2 ("Step Two")

Grievance to Labor Relations Representative

If the grievance is not settled in the first step, the Employee's steward must fill out and sign the Step 2 grievance form. The steward must present the grievance form to the Company's designated Labor Relations/Human Resources Representative within fifteen (15) calendar days of the steward receiving a denial in Step 1.

A meeting will be held within ten (10) calendar days of receiving written notification of First Step appeal between the Grievance Committee of the Local Union not to exceed three (3) members including the Business Manager or his Designee and the Department Manager and Labor Relations/Human Resources Representative to discuss the grievance. The Labor Relations/Human Resources Representative, will have ten (10) calendar days to respond with an answer in writing. The response will be forwarded to the steward by the Labor Relations/Human Resources Representative.

If the Union is dissatisfied with that decision, the matter may be referred to the next step within fifteen (15) calendar days following the Company's decision.

(Id. at 85-86.)

Step 3 ("Step Three")

Written Appeal to Department Manager

If the grievance is not settled under Step 2, the grievance must be submitted in writing, within fifteen (15) calendar days of a denial in Step 2, to the respective Vice President. A meeting will be held within thirty-(30) calendar days of receiving written notification of Second Step appeal between the Grievance Committee of the Local Union not to exceed three (3) members including the Business Manager or his Designee, and a Vice President of the Company, or his Designee, and a Labor Relations Representative to discuss the grievance. An International Representative of the I.B.E.W. [International Brotherhood of Electrical Workers] may also be present. The response will be forwarded to the Business Manager, or his designee, by the Labor Relations Representative within ten (10) calendar days.

(Id. at 86-87.)

Step 4 ("Step Four")

Arbitration

If the grievance is not satisfactorily settled at the 3rd Step, it may be referred at the request of either party to Arbitration within 45 calendar days of the receipt of the third step answer. The appointment shall be made from a list furnished to the parties under the procedure and rules of the American Arbitration Association (AAA).

Except for grievances involving discharge or as otherwise agreed, grievances must be scheduled and heard in arbitration in the order of appeal to arbitration.

The arbitration hearing shall be held as promptly as possible and the arbitration award shall be final and binding upon all parties, provided it does not exceed the authority of the Arbitrator. The Arbitrator's authority shall be limited to the application of this Agreement, and the Arbitrator shall have no authority to render an award that amends, alters, or modifies any provision of this Agreement.

In an arbitration relating to the discharge or suspension of an Employee, should the Arbitrator determine that the discharge or suspension was not for just cause, the Arbitrator may order reinstatement of the Employee with or without back pay for time lost. No more than one grievance may be submitted to or heard by any one Arbitrator at one time without agreement between the Company and Union.

No new issues may be raised in the arbitration step, which were not previously raised in the first three steps of the procedure, except issues involving timeliness or arbitral jurisdiction.

The written award of the Arbitrator shall be final and binding on the aggrieved employee(s), the Union and the Company.

The costs of the Arbitrator and hearing room shall be shared equally by the parties. All other costs shall be paid by the party who incurs them.

. . .

At all steps in the grievance procedure, the grievant and the Union representative should materially expedite the solution to the grievance by disclosing to the Company representatives a full and detailed statement of the facts relied upon. In the same manner, Company representatives should disclose all the pertinent facts relied upon by the Company. The parties may agree to return a grievance to a prior step of the grievance procedure, which shall then to be processed within the time limits as provided in such step.

(Id. at 87-92.)

On June 14, 2016, through his Union representative, Champagne filed a grievance disputing Maldonado's payment changes to the timesheet. The Union, on Champagne's behalf, claimed that PECO violated Articles 4.13 and 4.12 of the CBA by rejecting Champagne's request to be paid premium pay for working his regular shift after he voluntarily worked scheduled overtime to perform guaranteed switching before the start of those shifts. It alleged a violation of the "call out" and "rest period" provisions of Articles 4.12 and 4.13 of the CBA. (Id.)

Article 4.12 provides:

4.12. Rest Period Pay. After sixteen (16) or more consecutive hours of work or after sixteen (16) or more hours of work within a 24-hour period preceding the start of a scheduled tour of duty, employees will be given a rest period of eight (8) hours before resuming regularly scheduled work. Employees will be paid for the hours of this rest period that overlap scheduled working hours.

When conditions are such that an employee must report to work on a regular schedule before the expiration of the rest period of eight (8) hours, such rest period hours that remain will be paid for at the applicable overtime rate. This regulation does not apply when the sixteen hours of work required for rest period are accumulated by reason of traded workdays, change of schedule, or when hours normally granted for rest periods overlap the newly scheduled shift. Nor does this regulation apply to hours not worked for which a minimum pay bonus is allowed, such as a call-out and prearranged overtime minimum guarantees.

If, as a result of a call-out, an employee is directed to report to work immediately during the 8-hour period preceding their normally scheduled shift and are not

entitled to the 8-hour rest period allowed when an employee works sixteen (16) or more hours of work within the 24-hour period preceding a scheduled tour of duty, the employee will be entitled to paid rest period during the regularly scheduled shift equal to the time worked during the 8-hour period. This applies even though the employee did not work the day before the call-out.

When the call-out does not extend to the starting time for the regular shift, the rest period will be taken before resuming work on the regular shift. When the call-out extends to the starting time for the regular shift, an employee will continue working on the regular shift and the rest period will be taken during the last part of the regular shift. The supervisor may require the employee to remain on the job, but should attempt to provide relief in the case of fixed shift employees. In such cases, the rest period hours worked will be paid for at the applicable overtime rate. [9]

Article 4.13 states:

4.13. Call Outs. Employees called out without previous notice for work at any time outside of their regular work schedule shall be paid a minimum of four (4) hours at the appropriate hourly base rate.

Employees are expected to report to work as quickly and safely as possible. If an employee is going to be delayed he is to notify the on call supervisor at the time of the call.

Call out is computed from the time an employee receives the call or when it is estimated, by management, that the employee would have left home in the case of a delayed call out. The call out period ends when the call out becomes continuous with his regular shift or when the work is completed and includes an estimated traveling time from the job back to the employee's home, as determined by management.

(Id. at 27-30.)

In essence, the Union argued that Champagne should be paid for the additional guaranteed switching hours he worked as if they were "call outs." (See Doc. No. 14-4 at 361-63.) It contended that Champagne was requested to report to work in the eight-hour period preceding the beginning of his normally scheduled shift, and then to remain on the job into the hours of his regularly

---

[9]  In particular, the Union relied on the following language of Article 4.12: "If as a result of a callout, an employee is directed to report to work immediately during the eight hour period preceding their normal scheduled shift . . . the employee will be entitled to a paid rest period during their regularly scheduled shift equal to the time worked during the eight hour period."

scheduled shift. Therefore, it claims that Champagne should have received overtime pay for the regularly scheduled shifts.

Maldonado and Champagne discussed the dispute, as required by Step One of the Grievance Procedure, infra. Because they could not resolve it during their discussions, Maldonado filled out the appropriate grievance form, and wrote:

> Employee was contacted on 4/22 with an opportunity to work ahead of his shift on 4/28 (4 hours) and 4/29 (8 hours). Employee agreed to come in and was paid back shift premium time and a half for all hours outside of his normal schedule. Employee received eight hours rest period between end of shift on 4/28 and start of shift on 4/29. This was not a callout. It was a work opportunity.

(Id. at 361.) The Union moved the grievance to the Step Two of the Procedure. (Id. at 362.)

To fulfill the requirements of this step, on July 27, 2016, representatives of both PECO and the Union had a meeting to discuss the payment issue. (Id.) In a memorandum dated August 12, 2016, PECO's response to the discussions was summarized as follows:

> The above-captioned grievance arises from Bruce Champagne being asked on Friday, 4/22/16 if he was interested in coming in ahead of his shift for guaranteed switching on 4/28/16 (4 hours ahead) and 4/29/16 (8 hours ahead). Mr. Champagne agreed to come in for both jobs and did, in fact, work the scheduled overtime.

> Later he told his supervisor he wanted premium pay for his regularly scheduled back shift hours for Friday 04/29/16 and Saturday 04/30/16. Since it was his regular shift, the supervisor denied him. He did, however, receive premium pay for the scheduled OT [overtime] he accepted.

> During the grievance meeting, the Union argued that Mr. Champagne should have been paid premium time, as this was a delayed callout. The Union is claiming that these actions are in violation of CBA Article 4.13 and 4.12.

> The Union's requested resolution was for payment for any and all time and rest period entitlement denied as a result of the captioned violations.

> After review and deliberation of the matters presented during that discussion, the Company [PECO] has determined that there's been no violation of the Collective Bargaining Agreement. OT [overtime] scheduled a week in advance is not a Call

out or Delayed Call. Moreover, even if it was a call out, Mr. Champagne's regular shift hours would still not be paid in "premium time."[10]

(Id. at 362.) The Union then moved the grievance to the third step of the Procedure. In another internal memorandum, dated December 7, 2016, Suzanne Rudder, a PECO Labor Relations representative described the parties' discussions as follows:

> The Union and the Company [PECO] met for a third step hearing on the above captioned grievance.
>
> The Union claims that grievant should have been paid rest period allowance after filing a 4 hour shift on April 28th and an 8 hour shift on the 29th. The Union maintains that since the grievant came in and work ahead of his regular shift, he should have been paid rest allowance in accordance with 4.12.
>
> The Company notes that the grievant was offered and accepted the work opportunity on April 22. Since he had 6 days of notice, the work opportunity was not a "call out." The Company refers the Union to Article 4 Section 13. In the absence of a call out, there is no rest due to grievant. As a result, there has been no violation of the CBA.
>
> The grievance and relief sought are denied.

(Id. at 363.)

## C. Arbitration[11]

Dissatisfied with the response at Step Three, the Union filed for arbitration with the American Arbitration Association ("Arbitration"). (Doc. No. 14-1 at 10.) The parties selected Kathleen Jones Spilker, Esquire, ("Arbitrator" or "Arbitrator Spilker") to hear and resolve the dispute. (Id.)

---

[10] The heading of this letter states that it was written by Joe Docimo and addressed to "Bruce Clemmer, Local 614." Apparently, Bruce Clemmer is a Union representative. Although unclear, it appears that Joe Docimo is a PECO representative. (Doc. No. 14-4 at 362.)

[11] The Arbitration proceedings consisted of hearings on September 28, 2017 and November 28, 2017, and post-hearing briefs from each party. (See Doc. Nos. 1, 13, 14.)

## 1.    The Union's Argument

During the arbitration proceeding, the Union's main argument was that PECO had an established practice of paying employees overtime rates for working their regular shift after being summoned to work during the hours preceding the shift regardless of whether they were notified in advance and regardless of the type of work they were asked to perform.  (Doc. No. 1-1 at 186-187.)

It relied on an arbitration award from 2015 that involved the same CBA that governs the present matter, called the Fareri award ("Fareri Award").  The Fareri Award originated from another case between PECO and Local 614 that raised the issue of whether employees who were called out in the hours preceding their scheduled shifts were entitled to rest period pay under the CBA.  (Doc. No. 1-3 at 6.)  In that case, PECO decided to schedule a number of back office employees, including the grievant, Angela Fareri, to work during Hurricane Irene.  (Id.)  PECO notified these employees several days in advance of the time they were expected to report to work ahead of their normal shift.  (Id. at 7.)  Fareri requested rest period pay pursuant to Article 4.12, and initially received it.  (Id.)  PECO later decided she was not eligible and deducted the money from her paycheck.  (Id.)  PECO reasoned that Fareri had been told in advance to report to work, and therefore she was not "called out" as the term is defined in the CBA because, in PECO's view, she was not directed to report to work immediately.  (Id.)

The Union, in that case, filed a grievance on Fareri's behalf, arguing that the intent of language of Article 4.12 was to ensure that employees receive rest period pay when they are called out to work immediately before their normal shift, and that a callout can be made in advance.  (Id. at 8.)  The Union makes the same argument in this case.  Arbitrator Lisa Charles ("Arbitrator Charles") sustained the Union's grievance in the Fareri matter, and ordered PECO to pay Fareri

the rest period pay that they deducted from her paycheck. (Id. at 11.) Arbitrator Charles ruled that because PECO had a past practice of awarding premium pay for callouts, which can occur even if an employee is notified in advance that they are to report to work in the future outside of their normal shift, the employee is entitled to rest period pay according to Section 4.12 and 4.13 of the CBA. [12] (Id.)

During the arbitration proceeding here, the Union made four arguments that stem from the Fareri award. They were: (1) the Fareri award must be given precedential effect, since it involves the same parties, the same contract provisions, and the identical issue as the matter here in dispute; (2) even if the Fareri award is not given precedential effect, there is sufficient evidence to find an established past practice of paying employees rest period pay when they are called out to work immediately during the 8-hour period preceding their scheduled shift; (3) though PECO seeks to distinguish this case from Fareri on the basis that Champagne volunteered for guaranteed switching and was not required to report for storm duty, this argument was never raised in the earlier stages of the procedure and, thus, excluded from consideration; and (4) the limitations the Company seeks to impose on the rest pay provisions of the CBA are not supported by the contract language and are at odds with the established past practice. (Doc. No. 1-1 at 7-9.)

The Union presented testimony from several long-term employees regarding this practice, which the employees labeled "delayed callout." (Id.) To support this argument, the Union also presented timesheets from other employees. (Id.)

Fred Baumeister, a PECO mechanic with twenty-nine years of experience, testified that employees who were notified in advance of the need to report to work on a given day prior to the

---

[12] In other words, an employee who was "called out" in the hours preceding their regularly scheduled shift was entitled to premium pay for the regular shift and the extra hours worked. The CBA that governs the dispute in this case also governed in the Fareri case.

start of their regular shift were considered to have received a delayed call out. (Doc. No. 1-2 at 52-53.) He explained that this meant at the commencement of the employee's regularly scheduled shift, he or she could go home and be paid rest period pay at a straight time rate for all hours worked in advance of their scheduled shift, or the employee could choose to "honor the shift" and receive premium pay for all of the hours worked. (Id. at 63.) Baumeister noted that there were many instances where he was notified in advance of the need to report before his regularly scheduled shift. (Id.) In those situations, he stated that he received premium pay for the time worked in advance of his regular shift, and paid rest period if he chose to go home, or premium pay if he chose to stay and honor the shift. (Id.) Similar testimony was provided by two other long-term PECO employees. (Id. at 46-63.)

PECO's Vice President of Electric Operations, Eric Helt, also testified at the hearing regarding the assignment of guaranteed switching work and other types of preventive maintenance by aerial line mechanics. (Doc. No. 1-1 at 201-208.) He stated that guaranteed switching is usually scheduled about six weeks in advance, and the work is offered on an overtime basis to the troublemen, following the overtime procedures in the area. (Id.) He noted that when an employee accepts the work, that employee is essentially scheduled for overtime. (Id.) Helt drew a distinction between scheduled overtime and a call out. (Id.) He stated that a callout occurs when PECO does not have the necessary resources available to respond to an event system. (Id.) He also pointed out that there are four level of call outs, depending on the seriousness of the event. (Id.)

Luis Maldonado, Champagne's DSO supervisor, testified that guaranteed switching is a voluntary overtime assignment which is offered and scheduled following the overtime procedure in the area. (Id.) He stated that he did not approve Champagne's request for work rest period pay

because this situation was not a callout, as Champagne volunteered to do guaranteed switching overtime work, and it was scheduled the week before.  (Id.)

## 2.    PECO's Argument

PECO's arguments in opposition were:

1.  Under the express terms of Article 4.12, rest period pay is triggered as a result of a call out.  This overtime was not a "call out" within the meaning of the Agreement [CBA] because Champagne was not "directed to report to work immediately during the 8 hour period preceding [his] normally schedule[d] shift."  Champagne is a rotating shift employee who accepted a voluntary, scheduled overtime opportunity six days in advance of the work.  This was not a call out just because this overtime was worked before his shift.  Moreover, the rest period pay provision relied on by the Union is triggered only when the employee, as a result of a callout, did not receive an 8-hour rest period before the start of his regular shift.  Here, it is undisputed that Champagne had 8-hours rest before reporting to work on April 28 and 8-hours rest before reporting to work on April 29.

    The Union's effort to morph previously scheduled overtime into a "call out" is contrary to the express terms of the Agreement [CBA] and to the well-established business practice in the utility industry which distinguishes between a callout, i.e. where the employee is called into work with no previous notice, and scheduled overtime, which is planned and accepted in advance;

2.  The Union's assertion that this was a "delayed call out" is not supported by the plain language of Article 4.13 and the Union's proposal for a "call out with delayed reporting time" provision was rejected by the Company in contract negotiations;

3.  The Charles Award relied on by the Union is distinguishable because the facts presented in that case involved back office employees required to report during a Level 4 storm on the PECO system and did not involve a field employee's voluntary acceptance of scheduled overtime six days in advance;

4.  The examples of rest period pay introduced by the Union did not involve scheduled guaranteed switching, do not rise to the level of a binding past practice, and in any event may not be used [to] contradict or supplement the express terms of the Agreement.

(Doc. No. 14-4 at 132-133) (internal quotation marks omitted).

PECO further argued that Article 4.6 of the CBA governs this dispute instead.  It provides in pertinent part:

<u>Overtime</u>.  For full time employees, premium compensation will be paid for time worked in excess of the employee's regularly scheduled shift, including back shift premium where applicable.

(Doc. No. 1-1 at 26.)  In sum, PECO maintained its position that Champagne should be paid at a regular rate for his regularly scheduled shift, and overtime pay for the guaranteed switching hours only.

### 3.     Arbitrator's Decision

The Arbitrator agreed with PECO.  Addressing the Union's argument that Champagne should be paid as though this situation involved a call out, she interpreted Section 4.13 of the CBA as follows:

> The concept of a call-out implies the need for immediacy, and it generally is used to respond to a situation where the Company [PECO] does not have enough employees available on the regular schedule to meet their needs.  Section 4.13 of the Agreement describes a call-out as occurring "without previous notice for work at any time outside of their regular work schedule."  Call-outs are frequently implemented in situations where the need for employees was not anticipated, such as storms or outages.  Moreover, response to a call-out is not absolutely voluntary.

(<u>Id.</u> at 193.)

Arbitrator Spilker then analyzed the Fareri Award, and found the present case to be distinguishable.  She explained:

> There was no immediate need to perform the guaranteed switching work such as would usually be the case if an employee were called out to respond to an event requiring increased staffing.  In fact, as Mr. Helt testified, guaranteed switching requires extensive planning, and it is always scheduled in advance, usually several weeks in advance.  The need for this work was not unanticipated, as in a typical callout situation involving storms or problems with equipment, which require more workers are needed in addition to those on the regular schedule. [sic]  The Grievant was given prior notice of the need to report, and he was not required to report outside his normal schedule.  Once he had accepted the job, his schedule was changed to reflect guaranteed switching as scheduled work.  In addition, the Grievant's acceptance of guaranteed switching work was completely voluntary.  He was under no obligation to make himself available for this job, and the work was offered according to the overtime allocation procedures.  He was not "directed to

report to work immediately during the 8-hour period preceding [his] normal scheduled shift."

> The facts and circumstances of this grievance are distinguishable from those that formed the basis for the [Fareri][ award. It is clear that this work did not involve a callout, but rather, previously scheduled overtime. Accordingly, the past practice of "delayed callout" that formed the basis for the Charles award is not applicable in this situation.

(Id. at 194.)

The Arbitrator also addressed the argument there is a past practice of paying overtime pay to employees for working their regular shift. She determined:

> The Union charges that even if the [Fareri] award is not found to be binding precedent, it has nonetheless proven that there was an established practice of paying employees at the premium rate for working their regular shift after they came in to work during the preceding shift, regardless of whether they were notified in advance and regardless of the type of work they were asked to perform. The four aerial Line Mechanics gave credible testimony regarding the asserted practice; however, none of the witnesses testified that he had been paid for work rest period in conjunction with guaranteed switching. Moreover, all of the time sheets submitted by the Union involved callouts for storm damage or outage investigation, which by their nature cannot be scheduled in advance. By contrast, the time sheets submitted by the Company showed that employees who worked overtime performing scheduled guaranteed switching were not paid premium pay for their regular scheduled shift. In addition, Supervisors Maldonado and Henry testified that throughout their tenure with the Company, guaranteed switching has always been scheduled in advance, and employees who accept the overtime assignments receive premium pay for the switching work and straight time for their regular shift.

> To the extent that there was an established practice of awarding premium pay to employees working their regular shift after they came in to work during the preceding shift, it applies to situations involving callout or delayed callout under Sections 4.12 and 4.13 of the CBA. The scope of past practice does not extend to the situation in this case where the overtime work was scheduled in advance and paid according to the provisions of Section 4.6. Here, the Grievant [Champagne] was not called out without previous notice, nor was he directed to report to work immediately during the 8-hour period preceding his normal scheduled shift. Accordingly, I conclude there was no violation of the Agreement [CBA] or past practice when the Grievant [Champagne] was denied premium pay for working his regularly-scheduled shift after working overtime on the preceding shift.

(Id. at 194-195.)

### III. STANDARD OF REVIEW

#### A. Cross-Motions for Summary Judgment

Granting summary judgment is an extraordinary remedy. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Montgomery Cnty., Pa. v. MERSCORP Inc., 795 F.3d 372, 376 (3d Cir. 2015); see also Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of fact. In reaching this decision, the court must determine whether "the pleadings, depositions, answers to interrogatories, admissions, and affidavits show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Favata v. Seidel, 511 F. App'x 155, 158 (3d Cir. 2013) (quoting Azur v. Chase Bank, USA, Nat'l Ass'n, 601 F.3d 212, 216 (3d Cir. 2010) (quotation omitted)). A disputed issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). For a fact to be considered "material," it "must have the potential to alter the outcome of the case." Favata, 511 F. App'x at 158. Once the proponent of summary judgment "points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. (quoting Azur, 601 F.3d at 216 (internal quotation marks omitted)).

"The same standards and burdens apply on cross-motions for summary judgment." Allah v. Ricci, 12–4095, 2013 WL 3816043 (3d Cir. July 24, 2013) (citing Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir. 1987)). "When confronted with cross-motions for summary judgment ... 'the court must rule on each party's motion on an individual and separate basis, determining, for

each side, whether a judgment may be entered in accordance with the summary judgment standard.' " Id. (quoting Marciniak v. Prudential Fin. Ins. Co. of Am., 184 F. App'x 266, 270 (3d Cir. 2006)). "If review of [the] cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts." Id. (citing Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998)).

### B. Judicial Review of Arbitration Awards

A collective bargaining agreement represents a contractual accord reached between an employer and its employees. Brentwood Medical Associates v. United Mine Workers of America, 396 F.3d 237, 240, 241 (3d Cir. 2005). If such a contract includes an arbitration clause, it is assumed that the parties bargained for a grievance resolution procedure in which an arbitrator would interpret the agreement. Id. It is not the role of a court to correct factual or legal errors made by an arbitrator. Major League Umpires Ass'n v. American League of Professional Baseball Clubs, 357 F.3d 272, 279 (3d Cir.2004). A district court may determine only whether or not an arbitrator's award "draws its essence" from the parties' collective bargaining agreement. United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc., 484 U.S. 29, 36 (1987); see also Pennsylvania Power Co. v. Local Union No. 272 of the Int'l Bhd. of Elec. Workers, AFL–CIO, 276 F.3d 174, 178 (3d Cir. 2001). Once a court is satisfied that an arbitrator's award draws its essence from a collective bargaining agreement, it is without jurisdiction to consider the award further. Brentwood Medical Associates, 396 F.3d at 241.

An award draws its essence from a collective bargaining agreement if its interpretation can in any rational way be derived from the agreement, viewed in light of its language, its context, and any other indicia of the parties' intention. United Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 379-80 (3d Cir. 1995). "As a general rule, we must enforce an arbitration

award if it was based on an arguable interpretation and/or application of the collective bargaining agreement, and may only vacate it if there is no support in the record for its determination or if it reflects manifest disregard of the agreement, totally unsupported by principles of contract construction." Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357, 360 (3d Cir. 1993) (internal quotation marks omitted). Therefore, we will not disturb an arbitration award "even if we find the basis for it to be ambiguous or disagree[ ] with [the arbitrator's] conclusions under the law." Citgo Asphalt Refining Co. v. Paper, Allied–Indus., Chem. & Energy Workers Int'l Union Local No. 2–991, 385 F.3d 809, 816 (3d Cir. 2004), (quoting Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters, 969 F.2d 1436, 1441 (3d Cir. 1992)).

## IV. ANALYSIS

Before the Court is Plaintiff's Motion for Summary Judgment (Doc. No. 13) and Defendant's Motion for Summary Judgment and to Confirm the Arbitration Award (Doc. No. 14).[13]

The Union seeks to vacate the Arbitration Award arguing that Arbitrator Spilker evinced a "manifest disregard" for the provisions of the CBA by ignoring Article X, which states in pertinent part:

> No new issues may be raised in the arbitration step, which were not previously raised in the first three steps of the procedure, except issues involving timeliness or arbitral jurisdiction.

(Doc. No. 1-1 at 83-92.) Particularly, the Union contends that the Arbitrator raised two issues at Arbitration that were not raised in Steps One through Three of the Grievance Procedure.

---

[13] The parties have also submitted the following responses and replies: Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment and to Confirm the Arbitration Award (Doc. No. 15), Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 16), Defendant's Reply in Support of its Motion (Doc. No. 17), and Plaintiff's Reply in Support of its Motion (Doc. No. 18).

According to the Union, they were: (1) whether a job assignment could be considered a call out if it involved if it specifically involved guaranteed switching work; and (2) whether such an assignment could be considered a call out if the employee "volunteered" for the job. (See Doc. No. 13-1.) The Union contends that in Steps One, Two and Three of the Grievance Procedure, PECO denied the grievance solely because it was not a "delayed callout." Then, at Arbitration, PECO introduced the argument that it denied Champagne's grievance because Champagne volunteered to do guaranteed switching work before his regular shifts. The Union further contends that Arbitrator Spilker exceeded her contractual authority under the CBA by giving decisive weight to PECO's purportedly new arguments in her decision. (Id.) The Union submits that the Arbitrator's conduct constitutes a "manifest disregard" for the provisions of the CBA because she effectively erased Article X by considering and relying upon issues not raised in earlier steps of the Grievance Procedure. (Id.)

Defendant asserts that the voluntarily nature of the guaranteed switching work was part of its reason for denying Champagne's grievance from the beginning. It notes that these issues were repeatedly mentioned by both parties at the Arbitration hearings and throughout the Grievance Procedure. (Doc. No. 14-1 at 19-27.) It further proffers that the issues Plaintiff frames as "new" are not new, but instead were the factual foundation of the dispute. (Id.) Most importantly, Defendants emphasize that the essence of Arbitrator Spilker's decision is derived from the CBA, and cannot be vacated for that reason alone.

Initially, it is important to note that there is a strong presumption under the Federal Arbitration Act, 9 U.S.C. § 1 et seq., in favor of enforcing arbitration awards. Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). As such, an award is presumed valid unless it is affirmatively shown to be otherwise, and the validity of an award is subject to

attack only on those grounds listed in 9 U.S.C. § 10, or if enforcement of the award is contrary to public policy. Exxon Shipping Co., 993 F.2d at 360 (quoting W.R. Grace & Co. v. Local Union 759, Int'l Union of Rubber Workers, 461 U.S. 757, 766 (1983)). With this presumption in mind, the Court will address each argument in turn.

**A. Arbitrator Spilker Did Not Violate the CBA**

Plaintiff's argument that Arbitrator Spilker violated the CBA by considering new issues at Arbitration is unfounded. But the issues Plaintiff characterizes as new were in fact raised prior to Arbitration.

Specifically, Supervisor Maldonado's notes from Step One of the Procedure state that PECO denied Champagne's grievance because he accepted a "work opportunity" and "agreed to come in" to work "guaranteed switching" hours before his regular shift. (Doc. No. 14-4 at 361.) Accordingly, Maldonado concluded Step One of the Procedure by stating, "[t]his was not a callout. This was a work opportunity." (Id.) Additionally, in the internal memorandum summarizing the outcome of Step Three, a PECO representative wrote:

> The Company [PECO] notes that the Grievant was offered and accepted the work opportunity on April 22. Since he had six days of notice, the work opportunity was not a "callout." The Company refers the Union to Article 4, Section 13. In the absence of a callout, there is no rest due to the Grievant. As a result, there has been no violation of the CBA.

(Id. at 363.)

Although PECO did not explicitly state that it was denying Champagne's request for overtime pay for his regular shifts of April 29, 2016 and April 30, 2016 because it was "voluntary" or because it involved guaranteed switching work, it is still clear from PECO's statements made

in the early stages of the Grievance Procedure that these principles were raised.[14]  By PECO's use

of the words "agreed to come in," "work opportunity," and "offered and accepted," the Union had

enough information about PECO's position in this matter to defend against it.  (Id. at 361-363.)

Notably, the Union did not dispute at any point in the Procedure that the pay period in question

included guaranteed switching work that Champagne opted to accept, as an employee typically

does when accepting an offer to do guaranteed switching work.  Therefore, the Union's argument

that the Arbitrator's consideration of these facts was error is unavailing.

In sum, because guaranteed switching and Champagne's voluntary acceptance of it were

argued during the earlier steps, the Union's contention that Arbitrator Spilker violated the CBA is

without merit.

### B.  The Court Will Not Interfere With the Arbitrator's Interpretation of the CBA

More importantly, the Union's argument fails because it is an attempt to interfere with the

Arbitrator's interpretation of the CBA.

Because Champagne contended that his additional guaranteed switching hours should

count as a delayed call out, it was necessary for the Arbitrator to analyze whether Champagne was

"directed" to report to work or whether he agreed on his own to work extra hours in response to a

"work opportunity."

In her decision, Arbitrator Spilker addressed this point by interpreting the CBA as follows:

> The concept of a call-out implies the need for immediacy, and it generally is used
> to respond to a situation where the Company does not have enough employees
> available on the regular schedule to meet their needs.  Section 4.13 of the
> Agreement describes a call-out as occurring "without previous notice for work at
> any time outside of their regular work schedule."  Call-outs are frequently

---

[14]  Importantly, Steps One through Three of the Grievance Procedure require the parties to have
in-person meetings to resolve the dispute.  Discussions from those in-person meetings are not
part of the record.  Therefore, the Court considers only the statements made by PECO in the
documents that memorialize these discussions. (Doc. No. 14-4 at 361-363.)

> implemented in situations where the need for employees was not anticipated, such
> as storms or outages. Moreover, response to a call-out is not absolutely voluntary.

(Doc. No. 1-1 at 193.) Her discussion of the voluntary nature of the guaranteed switching work, which Plaintiff takes issue with, was part of her permissible interpretation of the CBA.

The United States Supreme Court has clearly established that district courts do not have the authority to interfere with the merits of an arbitrator's decision if such decision is derived from an arbitrator's interpretation of the CBA. Eastern Associated Coal Corp. v. United Mineworkers District 17, 531 U.S. 57, 62 (2000) (as long as an arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, the court should not overturn his decision, even if it is convinced he committed serious error); see also United Steelworkers of America v. Enterprise Wheel and Car Corp., 80 S. Ct. 1358, 1359 (1960) (the "proper" judicial approach to a labor arbitration award is to "refus[e] . . . to review the merits").

The Third Circuit also has emphasized this strict policy in its review of arbitration awards. Eichleay Corp. v. International Association of Bridge, Structural and Ornamental Iron Workers, 944 F.2d 1047, 1056 (3d Cir. 1991) (a district court's review of arbitration awards is very narrow, and a district court should not an vacate arbitration award merely because it would decide the merits differently); see also U.S. Airline Pilots Association v. U.S. Airways, 604 F. App'x 142, 147 (3d Cir. 2015) (courts must uphold the award as long as it draws its essence from the collective bargaining agreement and can be rationally derived from that agreement; and it may vacate an award only if it is totally unsupported by the principles of contract construction.) "Only rarely, and in the most compelling circumstances, will a federal court tinker with an arbitral award made under the aegis of a collective bargaining agreement." Consolidation Coal Company v. Dist. 2, United Mine Workers of America, 169 F. App'x 704, 706 (3d Cir. 2006).

Because, it is clear that Arbitrator Spilkers' decision derives its essence from the CBA, this case does not present the rare circumstances required to vacate an arbitration award. Accordingly, summary judgment will be granted in favor of Defendant.

## V.      CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. No. 13) will be denied and Defendant's Motion for Summary Judgment and to Confirm the Arbitration Award (Doc. No. 14) will be granted. An appropriate Order follows.